Curtis *v.* McCullough.

## STATE OF NEVADA, ex rel. SAMUEL T. CURTIS, *v.* H. V. S. McCULLOUGH.

A writ issued against and served on a party which does not run in the name of " the State of Nevada," or purport to be by the authority of the " State of Nevada," confers no jurisdiction on the Court over the party named in the writ. But if a party on whom such a defective writ has been served comes into Court, and petitions for time within which to answer such writ, he thereby acknowledges the authority and jurisdiction of the Court, and waives all defects in the form of the writ.

The statute, having prescribed what shall be an appearance for certain purposes, does not preclude an appearance in a different manner for other purposes.

Although an alternative writ of mandamus may not properly be returnable in less than ten days after its issuance, yet if the respondent appears upon such writ and asks for time to make his answer, and that time is granted, he cannot afterwards be heard to complain that the writ was irregular as to the time when a return was required.

A general appearance not only waives defect in a writ, or summons, but gives jurisdiction over the person in cases where the writ was void.

As the affidavit on which an alternative writ of mandamus issues is required to be served with the writ, and it is the affidavit and not the writ which is required to be answered, it would seem unnecessary that the latter should contain all the allegations of the affidavit.

The power conferred on this Court by the Constitution to issue writs of mandamus, *quo warranto*, etc., is an original jurisdiction, and not merely auxiliary to its appellate jurisdiction.

The existence of corporations created in other States will be recognized by the Courts of this State. The power of the corporation, or of its officers under the laws of the State where created, will be inquired into in the Courts of this State when necessary to determine controversies arising here.

Officers of a corporation are not recognized as such in a State in which the corporation does not exist. But a foreign corporation may have agents in any State.

There may be no *office*, technically speaking, to which relator may lay claim, yet he may have a *right* to represent the corporation as its agent; and the writ of mandamus, under our statute, is the proper mode for restoration to such right. The remedy afforded by this writ, under our statute, is broader than at common law.

The Court has jurisdiction to determine the rights of the individuals within its jurisdiction, each claiming under a foreign corporation, although it may have no jurisdiction over the corporation itself.

There being no other speedy and adequate remedy for the relator, mandamus is the proper remedy in the case made.

Mandamus is the proper remedy to put one into an office where the title of the relator is clear, and no other person is claiming the office under color of right.

Curtis *v.* McCullough.

Where the affidavit for an alternative writ of mandamus shows that the relator was appointed to a certain office, or agency, by the board of trustees of a foreign corporation, at a meeting of such board, legally called, an answer denying the legality of the call, appointment, etc., without stating any facts to show the illegality of the call, the meeting, and action of the board, raises no issue of fact, and is a mere nullity.

It being shown by the affidavit and answer that the relator was entitled to the office when he applied for the alternative writ, and so also when the original answer was filed he is entitled to his costs incurred up to that time.

A supplemental answer having shown that relator was legally removed from office, and defendant appointed since the filing of the original answer, the peremptory writ must be refused.

Where the law creating a corporation requires that the stockholders shall elect trustees annually, at such time, place, and manner as may be determined by the by-laws, the election must take place substantially every twelve calendar months. A set of trustees, holding office, cannot by a by-law extend their own term for three months beyond the period for which they were originally elected.

Trustees of a corporation can lawfully do nothing against the interest of the corporators, or to deprive them of their reserved rights.

No elective officer has a right to do any act which would prevent the election of his successor at the time fixed by law for such election.

This was an original application to this Court for a writ of mandamus.

When the writ was first applied for, Hillyer & Whitman, who were the regular attorneys and counsel for the Overman Silver Mining Company, represented the relator. Subsequently, when the new board of trustees of that company met, and by their action removed the relator and reinstated the respondent in the office of superintendent, Hillyer & Whitman ceased to represent the relator, and he substituted Mesick & Seely as his counsel. No decision in the case had been rendered before the meeting of the new board of trustees, and by consent their action was introduced into the case by an amended answer; and the case then came up for adjudication, not upon the facts as they appeared by the original affidavit when the writ was granted, but as they appeared by the amended answer, the replication thereto, and the admissions of the parties. The facts, as they were finally admitted to exist, sufficiently appear in the opinion of the Court.

*Mesick & Seely* made the following points:

There appearing no abuse of authority on the part of the Board of Trustees of the Overman Company in amending the by-law so as to make the annual election come off in October instead of July, the entire question before the Court is, whether the Board possessed any power for any cause to make the postponement. It is evident that by making the election to fall upon any named day of the week or month, the election could not be held annually, in the strict sense of that term contended for by relator ; for in the one case the same day of the week would not fall at the exact end of the year, and in the other it would sometimes fall on Sunday, in a series of years. The time is held as directory, and Courts do not and could not act strictly upon the principles of construction contended for by respondent. (Opinion of Court in *People* v. *Runkle*, 9 Johnson, 147 ; also in *Hughes* v. *Parker*, 20 N. H. 58.)

The principle must be inviolable by either Board or Court, or else there is none involved preventive of the action in question, had on the part of the Board amending the by-law, so as to make the annual election happen in October instead of July.

*But we are construing a statute of the State of California*, and no principle or precedent appearing to the contrary, we must or should adopt such a construction of their laws as is sustained by the highest Court of that State.

In the case of the *People* v. *Brenham*, 3 Cal. 477, two of the Judges express opinions exactly upon the point involved in this case.

In that case, the Statute Charter of San Francisco provided that the mayor, etc., should be " annually elected," etc.

Justice Murray says the term annually, it is conceded, means not a *measure* of time, but a succession of calendar years. So says Justice Lyons ; and also shows that a legislative interposition, such as we contend for, has been given to the word "annually" in the Constitution of California, in changing the day of election required by the Constitution to be held " annually." The reasons there assigned for the conclusions of those two Judges, as to how the word " annually" should be construed upon principle and policy, seem to us sound, and worthy of adoption by the Court in the case in hand.

It would be rather anomalous if the Courts of California should

Curtis *v.* McCullough.

pursue the line of these opinions in determining the same question before this Court, whilst this Court departed from it, thus arriving at exactly opposite conclusions upon the same statute. And there can be no reason for supposing that the doctrine of these opinions will be abandoned in that State. There can be no such policy discovered upon any principle, it seems to us, as to forbid the exercise of the power which we seek to justify on the part of the Board of Trustees.

The rule which would overthrow our position on this point would, it seems to us, cripple legislation, and might prove most pernicious to public and private interests.

We think the power existed to make. the amendment in question, and no abuse of that power is shown.

· Mandamus is the proper remedy, even though respondent is in the office or station claimed by the relator. (*Rex* v. *Barker*, 3 Burrows, 1265a; *Dew* v. *Judges of Sweet Springs*, 3 Henning & Mumford, 1; 20 Pick. 495.)

The case of *The People* v. *Steele*, 2 Bar. 416–20, we ask special attention to, as there are found many authorities in point, and the case itself is equally so. Also, *Kimball* v. *Lamprey*, 19 N. H. 215, seems in point. (Practice Act, Sec. 414.)

We claim that this is the only remedy in our case. The case of *The People* v. *Olds* we contend is not supported by either reason or the statute, so far as it enunciates a different doctrine from that for which we contend, namely: that the relative rights of the contending parties to the office or place may be determined in the proceedings for mandamus.

Upon the first calling of this case for argument, but subsequent to the time when respondent had asked and obtained time within which to answer, *Will Campbell, Williams & Bixler* and *Aldrich & DeLong*, as counsel for respondent, moved to quash the writ on the following grounds:

First.—Because said writ is not issued in the name, or by the authority of the State of Nevada, or by any Court of said State, nor can a right of office be tried by mandamus.

Second.—Because said writ is made returnable in less than ten days from the time of issuing the same, or the service thereof.

Curtis *v.* McCullough.

Third.—Because said writ does not state generally or otherwise the allegations against the said McCullough.

Subsequently, but before the amended or supplemental answer was pleaded, *Aldrich & Bixler* filed the following points on the merits :

When a person is in the office, the writ of mandamus will not lie to oust him and admit the relator. The proper remedy is by information in the nature of *quo warranto*. (*People ex rel. Arcularius et al.* v. *Mayor, etc., of New York*, 3 Johns. Cases, 79 ; *Fish* v. *Weatherwax*, 2 Johns. Cases, 217–10, Sec. 12 ; *People* v. *Scrugham*, 20 Barb. 302 ; Moses on Mandamus, 150 ; *People* v. *Olds,* 3 Cal. 167.)

After the new pleadings setting up the facts which had occurred since the last hearing were before the Court, the case was reärgued orally, and *Will Campbell, Esq.,* for respondent, made the following points :

The general incorporation law of California, which stands in lieu of a charter and the by-laws of the corporation, having made the election of trustees annual and fixed the day of the week and month when each annual election should take place, the stockholders were bound to take notice of the proper time of election, and such election would be good, even if no proper notice of the election was given. (Angell & Ames on Corporations, Sec. 418.)

The change of the day of election by the trustees is contrary to the charter, *i. e.*, the law under which the corporation derives its being, and must be disregarded. (Angell & Ames on Corporations, Sec. 345.)

The by-law is unreasonable in this, that it extends the term of office of the very men, and those alone, who voted for it; deprives the stockholders of the right to elect, and is manifestly detrimental to the interests of the corporation, as shown by the votes of those interested on the day of election. If the trustees can extend the time of election for three months, they can extend from month to month, *in perpetuo*. (*Vide* Angell & Ames on Corp. Sec. 347.)

The word " annual" must be received in its usual acceptation. (*Vide* Webster's Dict. Tit. " Annual.") In the laws of the United States the same word is used, " annual income tax;" in United

States Bonds, " interest payable *semi-annually.*" There are no two meanings to the word, and after diligent search I can find no judicial opinion construing it otherwise than Webster.

The certificates of incorporation were filed on the eleventh day of April, 1865. The by-laws then adopted fixed the election for the second Thursday of July, 1865 : from that day the year commenced to run.

The trustees mentioned in certificate of incorporation could by law only hold office for three months, then the election in compliance with law became annual.

The trustees having fixed the day of election, any change is contrary to Sec. 5 of the Act of California, which is the charter of the incorporation. The day once being fixed by the trustees, the statute regulates the time of all future elections, to wit : *annually.*

The burthen of proof is on the relator to show that the action of the Board of Trustees in depriving the stockholders of the right of election on the eleventh day of July was for a good purpose, or for the interests of the stockholders, the *cestui que trust ;* and no showing being made, and the stockholders deprived of a *right*, it will be presumed their action was unreasonable, vexatious, unequal, and detrimental to the interests of the corporation.

Opinion by LEWIS, J., BEATTY, C. J., concurring ; and JOHNSON, J., concurring in judgment.

This is an application by the relator, Curtis, for a writ of mandamus to compel the defendant, McCullough, to deliver to him all the books and papers belonging to the office of Superintendent of the Overman Silver Mining Company, and to admit him to the enjoyment of all the rights incident to that position. Upon the first showing, we came to the conclusion that the peremptory writ should issue ; but the showing made upon the supplemental answer, by which it was made to appear that the defendant, after the filing of his first answer, had been legally and duly appointed to the position claimed by the relator, we are compelled to refuse the writ.

Such being the case, Curtis, the relator, is justly entitled to the costs of this proceeding incurred up to the time of the filing of the

supplemental answer. It therefore becomes necessary to give our views of the case as it stood when first submitted, which we will proceed to do, and then dispose of the questions raised on the supplemental answer.

By the affidavit upon which this application is based, it appears that the Overman Silver Mining Company is a corporation organized under the laws of the State of California, A.D. 1866, for the purpose of carrying on the business of mining in the county of Storey, in the State of Nevada; that the mine of the corporation is located in that county, and that it is now engaged in working and developing it. After alleging the election of a Board of Trustees in accordance with the Articles of Incorporation, it is further alleged that the by-laws of the corporation required and made it the duty of the Trustees to elect a Superintendent of the mine, whose duty it should be to take charge of the company's business in this State, and that such Superintendent should hold his office or position during the pleasure of the Board of Trustees; that on the twenty-fourth day of May, A.D. 1867, the defendant, McCullough, was elected Superintendent, to hold and enjoy that office during the pleasure of the Board of Trustees; that immediately after his election he entered upon his duties, and received from his predecessor and took charge of all the books and papers belonging to his office; and that from that time to the present he has discharged the duties and retained possession of all the books and papers belonging to the office.

It is then stated that a meeting of the Board of Trustees was held on the nineteenth day of June, A.D. 1867, and that at such meeting the defendant McCullough was removed from the supenritendency of the mine by the Board, and that one John Lambert was appointed in his stead. That on the twenty-first day of June, two days after such removal, another " meeting of said Board of Trustees was held at the office of the company, at the city of San Francisco, upon a legal call therefor; that at such meeting all of the Trustees were present, and that at such meeting another resolution was legally passed and adopted by said Board of Trustees removing said John Lambert from the said office of Superintendent and appointing the relator as his successor, and directing the said

John Lambert and the defendant McCullough to deliver to the relator possession of the mine of said company, and all the property and books in his or their possession belonging to said company." * * * * That after Lambert and the defendant McCullough had been notified of the action of the Board of Trustees, the relator personally demanded of them " possession of the works and mine of said company, and requested of each of them to be allowed to enter upon the discharge of his duty as such Superintendent, and at the same time demanded of said McCullough and Lambert possession of the books and papers pertaining to said office; that the said Lambert thereupon informed the relator that he was not in possession of the books or papers of said company pertaining to said office, nor of the works or mine of said company, and that he did not pretend to be the Superintendent thereof; but that the defendant McCullough unlawfully and wrongfully refused, and still unlawfully and wrongfully refuses to deliver said books and papers to the relator, or to transfer to him the control of said mine and works, or to allow relator to enter upon the discharge of the duties of his said office to which he has been appointed.  Relator further says that he is legally entitled to the possession of said books and papers, and to perform the duties of said office."  We have deemed it necessary to a clear understanding of the case, to set out these statements of the affidavit in *hæc verba*.  Upon this affidavit an alternative writ of mandamus was issued, commanding the defendant to deliver the books and papers pertaining to the office of Superintendent of the Overman Mine to the relator, and to allow him to enter upon the duties of that position, or to show cause on the twenty-eighth day of June, why he had not done so.  Two days after the issuance of this writ the defendant appeared by counsel, and applied to this Court for further time to prepare his answer and make his showing.  The affidavit upon which that application was based was made by McCullough's attorneys, who, after stating that they are counsel for the defendant, say: " That it is the intention and object of the defendant to appear in this action and show to this Court by the records of the proceedings of the Board of Trustees of the Overman Silver Mining Company, that the removal or pretended removal of the defendant from the superintendency of

the said mine was and is void; and that said McCullough is now and has continued to be lawfully such officer, and as such is entitled to hold, occupy and enjoy said office, and to continue in the possession of the books and papers of said company; that the defendant's answer cannot be properly prepared until certain documents can be obtained from San Francisco; that deponents believe and aver that it will be impossible to properly prepare and present their answer in this case in less time than one week from this date." Upon this showing and application of counsel for defendant, this Court extended the time for the showing and filing the answer, in accordance with the wishes of counsel.

Upon the day thus fixed, at the request of counsel for defendant, for filing the answer and showing cause, a motion to quash the writ was made upon the following grounds:

1. Because the writ did not issue in the name of, or by the authority of the State of Nevada, or by any Court of said State.

2. Because the writ was made returnable in less than ten days from the time of issuing it or service upon the defendant.

3. Because the writ did not state generally or otherwise the allegations against the defendant.

We will dispose of these points in the order in which they are presented. And, first, it is admitted the writ is defective, as claimed by counsel. The Constitution declares that " the style of all process shall be 'The State of Nevada.' " The State is the sovereign by whose power alone the citizen can be compelled to appear in its Courts to answer to an action brought against him. There is no other authority by which those tribunals can obtain jurisdiction of the citizen, except by his own consent or voluntary submission to their jurisdiction. However, after such jurisdiction is once obtained, whether by legal process or by the voluntary acknowledgment of the authority of the Court to determine his rights, the jurisdiction over the person is complete for all the purposes of that proceeding, provided the tribunal has jurisdiction of the subject matter. In this matter, we are satisfied that the defendant McCullough would have lost no rights by a refusal to obey the writ because of the informality suggested. Had the Court, upon his refusal to appear, rendered judgment against him, or ordered the issuance of a per-

emptory mandamus, he could at any time have had the proceedings set aside upon motion for that purpose.   Or he could have appeared specially for the purpose of setting aside the defective writ, without acknowledging the jurisdiction of the Court; for by appearing to object to the jurisdiction over him, it could not be said that he thereby acknowledged such jurisdiction.   But instead of pursuing one of these methods, the defendant chose to appear in the proceeding, not for the purpose of objecting to the jurisdiction of the Court, but to ask for its affirmative action in his favor, after a full acknowledgment of its jurisdiction over him.   As may be seen by the affidavit of his counsel which has been referred to, it is stated that the answer could not be prepared in the limited time given by the Court, and they ask that the time for answering and showing cause why a peremptory writ should not issue be postponed for a week beyond the time fixed in the writ.   They say that it was their intention to show that the removal of the defendant from the superintendency of the Overman Mine, and the appointment of the relator, were unauthorized acts and void, and that the defendant is the lawful Superintendent and entitled to the enjoyment of that office. The Court was led to believe by that affidavit that, if the required postponement was granted, these facts would be shown upon the hearing.   Upon that understanding the postponement or continuance was granted.   However, instead of such showing, counsel appear and claim that the Court had no jurisdiction over the defendant, and ask that the writ be quashed ; but such a motion seems rather out of place, following as it did the affidavit for continuance, and the action of the Court upon it.   That affidavit, it seems to us, gave the Court as complete jurisdiction of the defendant as an answer to the merits would have done.   An objection to the form of process cannot be taken after pleading to the merits of the action in which it is issued, simply because filing the answer is an acknowledgment of the jurisdiction of the Court, and when that is done the process to all intents and purposes becomes *functus officio*.

It would seem that no answer could more completely acknowledge the jurisdiction of the Court than this affidavit filed by counsel for defendant in this proceeding.   By asking an extension of the time to answer, the authority of the Court to require an answer is fully

recognized. Whether there can be such an appearance on the part of a defendant as to entitle him to notice of subsequent proceedings in the action, in any way except by answer, demurrer, or written notice of appearance served on the plaintiff, is not necessary to determine at present. Section 466 of the Practice Act seems to limit such an appearance to those three methods.

But it is claimed by counsel that there can be no appearance, except by one of the three methods mentioned in that section. We think otherwise. Although it declares that " a defendant shall be deemed to appear in an action when he demurs, answers, or gives the plaintiff written notice of his appearance, or when an attorney gives notice of appearance for him," it was evidently not the intention of the Legislature to make those the only means by which a defendant could appear, but simply that the filing and service of an answer, demurrer, or notice of appearance, should be such an appearance as would entitle the defendant to notice of all subsequent proceedings in the cause.

The second clause of the section referred to declares that " after appearance a defendant or his attorney shall be entitled to notice of all subsequent proceedings of which notice is required to be given." This right of notice of subsequent proceedings being given to the defendant in this clause of the section after appearance, the appearance referred to in the first sentence may clearly be taken to mean such appearance as would entitle the defendant to the notice mentioned in the second sentence of the section, and that it was not the intention to specify all and the only methods by which an appearance could be effected.

This very case shows the impolicy, we might almost say the absurdity, of any other construction. Here is the defendant in fact appearing in the action, acknowledging as clearly as it was possible for him to do that he was in Court under the writ, asking the Court for affirmative action in his favor, himself fixing the day for the showing of cause why the peremptory writ should not issue ; and yet upon that day objecting to the regularity of the writ, and denying that the Court had jurisdiction over him because of some informality in the process. We cannot believe that the Legislature intended to say that a defendant could not appear in an action ex-

cept by filing an answer, demurrer, or giving written notice to the plaintiff. He certainly can in fact appear. We cannot, therefore, sanction the doctrine that he cannot appear so as to give the Court jurisdiction of his person in any way except as specified in the section above referred to. Our opinion of the construction to be placed upon this section is strengthened by a reference to the New York code of 1848. It is observable that Title XV of our Practice Act was taken from and very nearly conforms to Chapter XI of the code. The section under consideration is contained in Title XV, and although not in the same language, it was evidently intended to make it conform substantially to Sec. 414 of the code. That section ends as follows :

" Where a defendant shall not have demurred or answered, service of notice or papers in the ordinary proceedings in an action need not be made upon him, unless he be imprisoned for want of bail, but shall be made upon him or his attorney, if notice of appearance in the action has been given." The verbiage of Sec. 466 of our Act is somewhat different; but it is quite clear that nothing more was intended than that provided by Sec. 414 of the code. We are aware that the dictum in *Steinbach* v. *Leese*, 27 Cal. 287, is against our construction; but a rule so manifestly against the universal practice of all Courts should not be adopted, except upon the most unequivocal language of the statute.

To the second point made on the motion to quash the writ, the answer is : If the writ could not be made returnable in less than ten days, the defendant also waived the right to insist upon that right by consenting to appear in less time than ten days. He appeared by his counsel, asked that the return day in the writ be postponed for one week, at which time the Court was given to understand the defendant would be prepared to show cause why the peremptory writ should not issue. He should not be permitted, therefore, to take advantage of the fact that the writ was made returnable in less than ten days, when to all intents and purposes he consented to a hearing, or to make his showing in less time than that.

A general appearance waives all irregularity in the writ. (*Bowles* v. *Stoddard*, 7 John. 207.) Even where the process is void, if the defendant appear he is regularly in Court; (*Pixley* v.

*Winchell*, 7 Cow. 366) and Sec. 32 of the Practice Act declares that " a voluntary appearance of the defendant shall be equivalent to personal service of the summons upon him." Though the writ could not perhaps be regularly made returnable in less than ten days, yet as counsel appeared without raising that objection, and consented to show cause on a day fixed, the objection to the writ came too late.

And indeed, Sec. 425 of the Practice Act seems expressly to authorize the Court to make the writ returnable at any time. The third ground of objection to the writ is also untenable. The affidavit itself is by law required to be served with the writ; and as it is the affidavit and not the writ which under our practice is answered, it would seem utterly useless and unnecessary to repeat or set out its allegations in the process. *Lex neminem cogit ad vana seu inutilia peraganda.* But whether it be necessary or not is a matter of no consequence, and unnecessary to be determined in this case, as the general appearance of the defendant was a waiver of all such defects.

Having thus disposed of the question raised on the motion to quash, we will next consider the several questions raised by the demurrer.

*First.*—That this Court is strictly a Court of appellate jurisdiction, and cannot issue a writ of mandamus, except in aid of such jurisdiction.

It cannot be easily understood how there can be a difference of opinion upon this point. The language of the Constitution defining the jurisdiction and powers of this Court is very clear and explicit. It declares that " the Supreme Court shall have appellate jurisdiction in all cases in equity; also, all cases at law in which is involved the title, or right of possession of real estate or mining claims, or the legality of any tax, impost, assessment, toll, or municipal fine, or in which the demand (exclusive of interest) or the value of the property in controversy exceeds three hundred dollars ; also in all other civil cases not included in the general subdivision of law and equity, and also on questions of law alone in all criminal cases in which the offense charged amounts to felony. The Court shall also have power to issue writs of mandamus, certiorari, prohibition,

*quo warranto,* and habeas corpus, and also all writs necessary or proper to the complete exercise of its appellate jurisdiction. Each of the Justices shall have power to issue writs of habeas corpus to any part of the State, upon petition by, or on behalf of, any person held in actual custody, and may make such writs returnable before himself, or the Supreme Court, or before any District Court in the State, or before any Judge of said Court." ( *Vide* Constitution, Art. VI, Sec. 4.) Here the power to issue certain writs named, including mandamus and *quo warranto,* is expressly given, and then follows a grant of power, which was unnecessary, because the Court would possess that power without express grant—that is, to "issue all writs necessary or proper to the complete exercise of its appellate jurisdiction." If the writs expressly mentioned were only intended as auxiliary to the appellate jurisdiction, it was certainly unnecessary to mention them, for the clause authorizing the Court to issue *all* writs necessary or proper to a complete exercise of its appellate jurisdiction most clearly includes all writs which could possibly be used as auxiliary to such jurisdiction. Without, therefore, convicting the members of the Constitutional Convention of gross tautology, it could not be held that the writs mentioned in the above section were intended to be issued only in aid of its appellate jurisdiction.

But there is a complete and conclusive answer to the position taken by counsel for defendant, independent of the grammatical construction of the language employed, viz: in the same sentence in which the power to issue mandamus is given, the Court is also authorized to issue the writ of *quo warranto.* We are unable to see how that writ could be used to aid the appellate jurisdiction of the Court. It is always the foundation of an original proceeding, discharging in fact the same functions as a summons in an ordinary action. Hence, it would seem as impossible to use *quo warranto* in aid of appellate jurisdiction as a summons itself.

The fact that the power to issue that writ is given in connection with the other writs mentioned would seem to be conclusive in favor of the original jurisdiction of the Court. Such has been the holding in California upon language identical with that employed in the Constitution of this State, with the exception that the power to issue

the writ of *quo warranto* is not given to the Supreme Court of that State. (*Perry* v. *Ames*, 26 Cal. 372.)

We therefore conclude, not only from the language of the Constitution itself, but from the decisions in California upon the same question and upon similar language, that the power of this Court to issue the writs mentioned is not confined to cases where it may be necessary to aid its appellate jurisdiction, but that it may issue them as the foundation of an original proceeding.

Again, the jurisdiction of the Court is questioned because " the Overman Silver Mining Company is a foreign corporation, organized and existing in the State of California, and subject to its laws, and because the appointment of both the applicant Curtis and McCullough were made in the State of California, and the question of the right of either to exercise the powers of Superintendent is cognizable in the Courts of California."

It is very true, as argued by counsel, that a corporation can have no legal existence outside of the territorial limits of the sovereignty creating it. It is the creature of statute. Where the statute ceases to operate, the corporation ceases to exist. It must therefore dwell within the jurisdiction of the power which created it. It does not, however, follow that its existence cannot be recognized elsewhere, or that it may not transact business or enter into contracts in other States. In the case of the *Bank of Augusta* v. *Earl*, 13 Peters, 519, this question was elaborately discussed and settled; the learned Chief Justice, in delivering the opinion of the Court, using the following language :

" It (a corporation) is indeed a mere artificial being, invisible and intangible. Yet it is a person, for certain purposes, in contemplation of law, and has been recognized as such by the decisions of the Court. It was so held in the case of the *United States* v. *Amedy*, 11 Wheaton, 412, and in *Beaston* v. *The Farmers' Bank of Delaware*, 12 Peters, 135. Now natural persons, through the intervention of agents, are continually making contracts in countries in which they do not reside, and when they are not personally present when the contract is made; and nobody has ever doubted the validity of these agreements. And what greater objection can there be to the capacity of an artificial person, by its agents, to make a

contract within the scope of its limited powers in a sovereignty in which it does not reside, provided such contracts are permitted to be made by the laws of the place? The corporation must no doubt show that the law of its creation gave it authority to make such contracts through such agents; yet, as in the case of a natural person, it is not necessary that it should actually exist in the sovereignty in which the contract is made. It is sufficient that its existence, as an artificial person, in the State of its creation, is acknowledged and recognized by the law of the nation where the dealing takes place, and that it is permitted by the laws of that place to exercise there the powers with which it is endowed."

True, the laws of the State creating a corporation cannot, *ex proprio vigore*, authorize it to contract or transact business in another State. Such rights depend entirely upon the will of the sovereignty where the transaction takes place or the contract is entered into. It is only by what is called the comity of nations that even the existence of the corporation at the place of its creation is recognized by the Courts of other States or nations. By it alone are they permitted to enter into contracts in foreign countries or other States, and to sue in their Courts. But this comity is uniformly observed amongst all Christian nations, and between the several States of the Federal Union.

Chief Justice Taney, in the case already referred to, says upon this point: " It is needless to enumerate here the instances in which, by the general practice of civilized countries, the laws of the one will, by the comity of nations, be recognized and executed in another where the rights of individuals are concerned. The cases of contracts made in a foreign country are familiar examples, and Courts of Justice have always expounded and executed them according to the law of the place in which they were made, provided the law was not repugnant to the laws or policy of their own country.

" The comity thus extended to other nations is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered, and is inadmissable when contrary to its policy or prejudicial to its interests. But it contributes largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignty to which they belong, that Courts of justice have

15

continually acted upon it as a part of the voluntary law of nations."

That the Courts of one State will recognize the existence and enforce the contracts of a foreign corporation, executed without its limits, is fully settled in that case; and the rule was afterwards affirmed by the same Court in the case of *Bunyan* v. *Coster's Lessees*, 14 Pet. 122.   If the Court of the State wherein the contract was executed by a foreign corporation will enforce such contract, and receive proof of the existence of such corporation, it must, *ex necessitate*, have the power to inquire into and determine whether the corporation acted within the scope of the powers conferred upon it by the law of its creation in entering into such contract.   Whether the corporation has the *power* to transact business or enter into contracts beyond the limits of the sovereignty creating it, depends upon the law under which it is organized; whether it *may* do so depends upon the will of the State where it attempts to carry on such business.   Such Court may, therefore, in enforcing any contract executed by a foreign corporation, or determining any rights growing out of the action of such corporation, look to the law or charter creating it, and the by-laws adopted by it, for the purpose of ascertaining whether it acted within the legitimate scope of its authority in executing the contract or enforcing a right.   So it was held by the Supreme Court in both the cases above referred to.

It is not claimed, and indeed we are satisfied it could not be successfully maintained, that the State of Nevada has ever expressed an unwillingness to allow foreign corporations to carry on the business of mining within her territory; but, on the contrary, her entire legislation on the subject of corporations indicates a purpose to permit it.   It is a part of the history of the Territory, and also of the State, that a majority of the mines within its limits have been and now are worked by corporations organized in other States.   As under such circumstances the Legislature has shown no disposition to prohibit it, the legal presumption is that the State recognizes their existence under the laws of the State where they are created, and concedes to them the privilege of conducting the business for which they were created within its limits.   Indeed, in the absence of any positive law, the presumption in such cases always is that the laws of a foreign nation are tacitly adopted.

Curtis *v.* McCullough.

" In the silence of any positive rule," says Mr. Justice Story, " affirming, or denying, or restraining the operation of foreign laws, Courts of justice presume the tacit adoption of them by their own Government, unless they are repugnant to its policy, or prejudicial to its interests.   It is not the comity of the Courts, but the comity of the nation, which is administered and ascertained in the same way, and guided by the same reasoning, by which all other principles of municipal law are ascertained and guided."   And this language was quoted with approbation by the Supreme Court of the United States in the case of *The Bank of Augusta* v. *Earl, supra.*

By applying these general principles to the case at bar, we arrive at the conclusion that the Courts of this State must recognize the existence of foreign corporations at the place of their creation ; that so far as it is possible to ascertain, it is not considered to be in contravention of the policy or interest of this State to prevent foreign corporations from carrying on the business of mining within its territorial limits.; that the Courts of this State ought to enforce all valid contracts made by such corporations within the State,· and enforce and protect all individual rights acquired from them to the utmost extent of their jurisdiction.

But it is claimed by counsel for defendant, " that the officers of a foreign corporation cannot be recognized as officers beyond the limits of the sovereignty which created the corporation ; that their official character ceases the moment they pass such limits, and therefore there is no office into which the relator can be admitted."

In *McQueen* v. *The Middleton Manufactory Co.*, 16 Johnson, 7 ; *Brobst* v. *Bank of Penn.*, 5 Watts & S. 379, it was held that the officers of a corporation could not be recognized in their official character out of the jurisdiction of the State creating the corporation ; but in those very cases the distinction is made between an officer of a foreign corporation and its agents.   It is admitted by all the authorities that such corporations may be represented by, and may transact business in other States through their agents, and that such agents will be recognized as the representatives of the corporation.   ·

Though technically a foreign corporation and its officers cannot exist as such beyond the limits of the power creating them, yet it

is conceded that the authority and power of their agents will be respected as the agents of a natural person residing in another State would be, the corporation being an artificial person, with the same right to be represented by its agents as a natural person. Hence, there may be no office in its technical sense, to the enjoyment of which the relator has a right, yet here is the right to represent the corporation, to act for it as its agent, and the position as agent, which he claims; the enjoyment of which he alleges the defendant is depriving him of. Now it will be observed that the remedy by mandamus under the statute of this State is not confined to cases where a person is deprived of the enjoyment of an office, but it may be issued " to compel the admission of a party to the use and enjoyment of a *right* or office to which he is entitled, and from which he is unlawfully precluded by such inferior tribunal, corporation, board or *person.*"

The remedy by this writ, under the statute of this State, seems much more extensive than it was at common law, and this case seems clearly to be embraced within its provisions. If the relator be the agent of the corporation, and the defendant is depriving him of the enjoyment of the right to act for his principal, that would seem to be precluding him from the enjoyment of a right to which he is entitled. The Court has complete jurisdiction of the parties, and the power to determine which of them has the right to the position claimed by the relator. Why then may it not afford the relator the relief to which he shows himself entitled? Admitted that the Court has no jurisdiction of the corporation; but it has of the relator, who claims the enjoyment of certain rights acquired from the corporation. No judgment can be rendered here which will bind the corporation; this proceeding is simply between individuals over whom the Courts of this State have jurisdiction, but who claim their rights from a foreign corporation. The source from whence they derive their rights is a matter of no consequence, if the Court has jurisdiction of the individuals.

But has the relator any other " plain, speedy" and adequate remedy " in the ordinary course of law?" If he has, it is admitted he is not entitled to the remedy by mandamus. We know of no other speedy and adequate means by which he may be placed

in the enjoyment of the right which he claims.   The recovery of
the books and papers which pass with the agency would not neces-
sarily place the relator in the enjoyment of the right which he claims.

It is necessary that the employés of the corporation should know
who is the legitimate representative of that body.   The recovery of
the books and papers would not establish that fact.

The relator, if he be the duly authorized agent, has the right to
discharge the duties and receive the emoluments connected with
that position, but the recovery of the books and papers would not
afford him the relief to which he is entitled.   It is claimed that an
information in the nature of *quo warranto* is the relator's proper
remedy—that the title to an office cannot be tried by mandamus.
But it is also urged by the counsel who makes this point, that the
Overman Silver Mining Company, being a foreign corporation, can
have no officer within the State of Nevada ; that neither the relator
nor defendant can be recognized within this State as an officer of a
foreign corporation, but only as its agent.   However this may be,
we are satisfied the authorities will support the proposition that
mandamus is the proper remedy to compel the admission of a person
to an office or position to which he is entitled, when it is not filled
*by another claiming* under color of right.   In such case, if the
position be not filled or claimed by another, there would be no title
to try, hence *quo warranto* would be unnecessary.

In the case of *Strong, petitioner, etc.*, 20 Pickering, the Court
said : " Mandamus is the proper process for restoring a person to
an office from which he has been unjustly removed.   *   *   * So
also it lies to admit any one to an office, a service or a franchise,
from which he is unlawfully excluded."

In *Dew* v. *The Judges of Sweet Springs*, 3 Heming & Mumford,
1, the Supreme Court of Virginia held, upon thorough argument,
that mandamus was the proper remedy when the title of the appli-
cant is clear.   Justice Roane concludes his consideration of that
question in the following language :

" I take it, therefore, that even in England, and in relation to
cases within the statute of Anne, the possession of the office by
another is no impediment to a mandamus where the title of the in-
cumbent is clearly void, and where no utility can result from a trial

on a *quo warranto* information, and *a fortiori* in this country, where
the proceeding by information is not guaranteed to every citizen,
but must be pursued, if at all, by permission of the Attorney Gene-
ral under the common law." So it was held in *Kimball* v. *Lam-
prey*, 19 N. H. 215; *The People ex rel. Benjamin Griffin* v.
*William Steele*, 2 Barbour, 397; *Rex* v. *Barker et al.*, 3 Burr.
1265. In this last case Lord Mansfield said: "Where there
is a right to execute an office, perform a service or exercise a fran-
chise, (more especially if it be in a matter of public concern, or
attended with profit) and a person is kept out of possession or dis-
possessed of such right, and has no other specific legal remedy, this
Court ought to assist by a mandamus, upon reasons of justice."

We do not hold that the title to an office may be tried by man-
damus, because, with our view of the pleadings in this case, no such
question can arise; but simply that mandamus is the proper remedy
to compel the admission of a person to a private right or office, from
the enjoyment of which he is excluded, and where there is no other
person claiming it under color of right. In this case there is no such
claim. The defendant's answer, raises no issues of fact whatever,
and upon it we are clearly of opinion that the relator was entitled
to the peremptory writ. The affidavit alleges that a meeting of
the Board of Trustees of the Overman Company was held on a legal
call therefor on the twenty-first of June; that at that meeting the
defendant was removed from the position of Superintendent and
the relator elected in his place. This statement or allegation is
met in the answer by a denial that the call for a meeting was *legal*.
It is denied that the resolution removing defendant and appointing
the relator was *legally* adopted; that the Board of Trustees which
passed the resolution was a *legal* board; and the reason given for
not delivering the books and papers, and for not allowing the rela-
tor to enter upon the discharge of his duties as Superintendent of
the Overman mine, is because the relator was *illegally* appointed.
And again, the defendant denies that the relator is *legally* entitled
to the possession of the books and papers, or to have the control
of the works and mine, or to perform the duties of said office. No
facts whatever are stated in the answer showing why the proceed-
ings of the Board of Trustees which met on the twenty-first of

June were *illegal.* The simple statement of the defendant is presented, that the call for the meeting itself, the resolution, and all the proceedings of the Board were *illegal.* But that is not sufficient. The grounds upon which it is claimed the proceedings were illegal should have been stated in the answer, so as to enable the Court to judge of their legality, and to apprise the relator of the exact defense to be made. By simply denying the legality of the facts alleged in the affidavit, the facts themselves are admitted. To deny that the resolution was legally adopted, is an admission that it was in fact adopted. Hence it is necessary to state the facts upon which the illegality is claimed. The same rules to a great extent which govern pleadings in ordinary actions are applicable to the return on mandamus. The return must be direct and positive, and not argumentative. The facts, and not mere conclusions of law, must be stated. (Vide Bacon's Abridgment, "Mandamus.")

And Section 418 of the Practice Act provides that the answer shall be made in the same manner as an answer to a complaint in a civil action. We conclude, therefore, that upon this answer being filed the relator was entitled to the peremptory mandamus, and that no issue was raised upon the right to the enjoyment of the position claimed by the relator. Having shown himself entitled to the writ at the time he applied for it, and at the time the defendant filed his answer, he is entitled to his costs incurred up to that time, notwithstanding the supplemental answer afterwards filed sets up a fact which, being established, shows that the relator has lost his right to the writ since he commenced this proceeding, it being shown that the defendant since that time has been legally elected to the position of Superintendent of the mine.

By the supplemental answer, which was filed by consent of parties, it is alleged that since the original answer and hearing, the Trustees of the Overman Mining Company, at a meeting held on the eleventh day of July, elected the defendant to the position which is claimed by the relator. This fact is admitted by counsel for the relator; but it is claimed that the Trustees who elected him were not the legal Board, and had no power to elect the defendant. The facts upon which this claim is based are these: It appears

that the law under which the corporation in question was organized provides that the Trustees shall be " *annually* elected by the stock-holders of the company, at such time and place, and upon such notice, and in such mode as shall be directed by the by-laws of the company." By the by-laws of the company, the second Thursday of July of each year was fixed as the time for the annual meet-ing of the stockholders. It is also provided that the by-laws may be amended at any meeting of the Trustees. At a meeting of the Board, held on the nineteenth day of June, A.D. 1867, the Trustees amended Article 14 of the by-laws, as to the time of holding the annual meeting, by fixing it on the second Thursday of October. This amendment was made only a few days before the time fixed by the laws for the regular annual meeting of the company. It is admitted by counsel for relator that if the Trustees exceeded their power in postponing the annual meeting of the stockholders from July to October, the defendant is entitled to the position which is claimed by the relator, because regularly appointed by the new Board of Trustees which was elected at the meeting of the stockholders on the second Thursday of July. It is, however, claimed that the old Board had a right to amend the by-laws so as to postpone the annual meeting to October, and that having done so, the meeting and election which took place on the eleventh of July was unauthorized and illegal. The only question, therefore, presented for consideration upon the supplemental answer is whether the amendment of Article 14 by the old Board of Trustees was legal. In our opinion it was not. The law requires an *annual* election of Trustees. Annual, from the Latin *annus*, usually means yearly, or every twelve months.

Wherever used in contracts it is construed to mean every twelve calendar months. Annual interest is interest payable every twelve months. Annual rent is construed in the same way. But the expression " annually elected," as used in the Corporation Law of California, would not perhaps admit of this very strict construction.

In requiring an " annual " election of Trustees, the evident pur-pose of the Legislature was to limit the term of office to twelve months, or as near to that period as practicable ; that a uniform rule should be adopted, so that each successive Board of Trustees

should hold office for one year.   It would perhaps be impossible to fix a period which would always recur within twelve months exactly, and upon which an election might be held, because the calendar day may be the Christian Sabbath, and a given day in the week in any month would not always agree precisely with the solar year.

But if a uniform rule be adopted which, when followed, would give each successive set of officers twelve months' term of office, as near as practicable, that would doubtless meet the requirements of the statute.   As for example, if a movable holiday be fixed on, as the day of election, though it might not always recur within three hundred and sixty-five days, yet that would be considered an annual election and regular.   (*People* v. *Rankin*, 9 John, 147.) However, to extend the term of office to fifteen months would not certainly meet the spirit of the statute, and would seem to be irregular.

Again, notwithstanding the Trustees are authorized to amend the by-laws, yet it must be conceded that they have not the right to so amend them as to deprive the stockholders of those fundamental powers by which they control the officers of the corporation.

That the Trustees should have the power to amend the by-laws, is almost a matter of necessity; but as the Trustees are simply the representatives of the corporators, they have no right to do anything in their official capacity which is prejudicial to the interest of their constituents, or to interfere with the powers which the stockholders have reserved to themselves.

An act done against the expressed wish of the stockholders would certainly be presumed to be against the interest of the corporation.

In the by-laws of the Overman Company, adopted by the stockholders, a day is fixed when they could meet for the purpose of electing officers of the corporation.

The power of electing such officers is vested in the stockholders by the law creating the corporation.   It is a power which the stockholders themselves could not transfer to the Trustees; which can be exercised only by them.   But to amend the by-laws so as to deprive the stockholders of that control or supervision over the affairs of the corporation which the right to elect their officers annually gives them, or to interfere with that right in any way,

would certainly seem to be incompatible with the relations existing between the Trustees and stockholders.   It is like an agent taking advantage of his position to deprive his principal of the power of removing him.   As the power of selecting the officers of the corporation is vested exclusively in the stockholders, and they could not, even if they chose, transfer that power to the Trustees, how can it be said the Trustees acted within the legitimate scope of their authority when they assumed the power of continuing themselves in office three months beyond the term fixed by the stockholders ?   Is not that substantially arrogating a power which the stockholders alone possessed ?   It was doing, in an indirect way, that which the law virtually denied them the power of doing directly.

The stockholders placed them in office to continue to the second Thursday in July: they, by virtue of their position, attempt to extend their term beyond the period thus fixed.   The unqualified power of selecting their officers, and the power of fixing the time when they may hold meetings for that purpose, is absolutely necessary to a proper control of the corporate affairs : and as the stockholders alone have the power of electing the officers, the time, place and manner of doing it should be absolutely under their control. But if their own officers may postpone the time fixed for such election, they may maintain themselves in office beyond the time for which they are elected, and that too in defiance of the wishes of the corporation, and to its prejudice.   By fixing a period when an election should take place, the stockholders prescribed the time during which they wished their Trustees to hold office and discharge the duties of their position ; hence an attempt on the part of such officers to continue themselves in such office beyond the prescribed period, would seem to be an act in direct opposition to the will of the stockholders : virtually, a denial of their right to remove the Trustees and elect new officers on the day fixed.

We announce, as a general principle, that no elective officer should be allowed to do any act which will prevent the election of his successor at the time and in the manner fixed by law, or by the persons having the power or right of election ; or to do any act

which will continue him in office beyond the time for which he was elected.

Here the Trustees have, by amending the by-laws, attempted to extend the term of their office three months beyond the time for which they were elected, and indeed to deprive the stockholders of the power to elect their successors at the time and place fixed for that purpose: and this without any apparent necessity or cause for so doing.

Such an act will always be viewed with jealousy by the Courts; and in this case, we hold it utterly unauthorized and void. As it was so treated by the stockholders, and as a regular meeting was held on the eleventh day of July, as provided by the by-laws, a new Board of Trustees regularly elected, and the defendant appointed to the position claimed by the relator, the peremptory writ must be denied.

The relator to have his costs incurred up to the time the supplemental answer was filed.

Opinion by JOHNSON, J.

I concur with my associates in the judgment they have pronounced in the foregoing opinion, but dissent from their views as to some of the grounds on which they rest the judgment. These points of difference, according to my understanding, though not material in the determination of this particular case, yet do become important, when they serve as an established rule, governing similar proceedings in the future action of our Courts. Therefore, I shall hereafter present, in a separate opinion, my views on the material points wherein I disagree with the other members of the Court.